651 So.2d 531 (1995)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Judge Angela MILLING a/k/a Angela Milling Bailey.
No. 94-CC-1033.
Supreme Court of Mississippi.
February 23, 1995.
*532 Luther T. Brantley, III, Jackson, for petitioner.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:
This proceeding comes to us pursuant to findings by the Mississippi Commission on Judicial Performance, ("the Commission"), recommending that Angela Milling, a/k/a Angela Milling Bailey, ("Milling"),[1] a justice court judge in District One, Newton County, Mississippi, be removed from office, assessed with the costs of this proceeding and fined in an amount equal to any judicial salary she may have received since October 1, 1994. The Commission found Milling's actions constituted willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute. The Commission's recommendation is now before this Court for review pursuant to Rule 10 of the Rules of the Mississippi Commission on Judicial Performance. As the Commission's findings and recommendations are well taken, we affirm. Therefore, effective immediately, Justice Court Judge Angela Milling, a/k/a Angela Milling Bailey, is removed from the office of Justice Court Judge, District One, Newton County, Mississippi, fined in the amount of any salary she has received since the date of October 1, 1994, as a justice court judge and assessed with all costs of these proceedings.

PROCEDURAL HISTORY
Angela Milling was at all times hereinafter mentioned a Justice Court Judge for District One of Newton County, Mississippi, as well as a Municipal Judge for the municipalities of Decatur and Hickory. She has since been terminated as Municipal Judge by both Decatur and Hickory. We write today concerning whether or not Milling should be removed from her position as a justice court judge and barred from ever again seeking or holding any judicial office.
The Commission received a citizen's complaint against Milling filed by Robert Earl Pierce, the District Supervisor for the Mississippi Bureau of Narcotics. The Commission filed a formal six count complaint of judicial misconduct on March 4, 1994. Count Five of the complaint was later withdrawn by the prosecutor for the Commission.
A two day formal hearing before a three member committee of the Commission was held on June 3, 1994, and July 8, 1994.[2] On August 29, 1994, the Committee filed its *533 Findings and Conclusions. On September 8, 1994, a Memorandum of Understanding was filed in which Milling, acting pro se, agreed to resign from office on or before October 1, 1994, and not to serve in any judicial office in the future. She also agreed to pay the costs of the proceedings. In return, the Commission agreed to "withhold any further action upon the Formal Complaint in this cause, contingent upon the Respondent's full and complete compliance ..." Although Milling submitted a letter of resignation as Justice Court Judge on September 19, 1994, she withdrew her letter of resignation on September 23, 1994. On October 13, 1994, Milling filed an Answer to the Committee Findings and Conclusions.
At its October 14, 1994, meeting the Commission voted unanimously to adopt the committee's findings of fact and to amend the Recommendations to recommend to this Court that Milling be removed from office, assessed costs and be suspended pending a final decision by this Court.[3] The Committee also voted six to one to recommend Milling be fined an amount equal to any judicial salary she may receive after October 1, 1994, the one dissenting member voting to recommend a $500.00 fine. The Commission thereafter filed its Findings of Fact and Recommendations with this Court.

STATEMENT OF THE FACTS
These proceedings arise from Milling's relationship with Donald Elmer Bailey, Jr. ("Bailey"), whom she met in June of 1993 when he was brought before her, as Hickory Municipal Court Judge, for an initial appearance. In July of 1993, Bailey was arrested by the Decatur Police Department for possession of alcohol and possession of paraphernalia. During the time he was being held on this charge an investigation was commenced and it was discovered that he had been indicted in the State of Georgia on five felony indictments charging him with drug trafficking, two counts of violating the Controlled Substances Act, possession of a firearm during the commission of a crime and possession of drug paraphernalia. It was also discovered Bailey was a fugitive from the State of Georgia, having jumped bond and returned to Mississippi. Shortly after being released on bond on the Mississippi charges, Bailey was arrested by the Newton County Sheriff's Department on the Georgia fugitive warrant. He refused to waive extradition.
Bailey pled guilty to the charges of possession of alcohol and possession of paraphernalia on August 10, 1993, before Milling as the Decatur municipal judge. Milling fined Bailey and suspended his driver's license. The next day Milling contacted Newton County Sheriff James Hanna about signing an affidavit so a fugitive warrant could be issued and bond could be set allowing Bailey to be released from jail. Hanna filed the affidavit with Milling and on August 11, 1993, she issued a fugitive warrant for Bailey. Bond was set by Justice Court Judge W.L. Freeman the next day. Bailey made bond and was released from jail.
Several witnesses testified that they saw Milling and Bailey together beginning in late September or October of 1993. Bailey was seen in the yard of Milling's home and on several occasions driving her car, even though she had personally suspended his driver's license. Milling admitted that on one occasion Bailey drove her car while he had a suspended license when she asked him to pick up her children. She stated she knew Bailey should not drive and that driving with a suspended license was supposed to carry a penalty of two days in jail and a fine. Sheriff Hanna stated that when Bailey was picked up for extradition to Georgia he was "arrested out of the car with [Milling]."
Milling stated that she did not start seeing Bailey socially until some time in October when Bailey's sister-in-law invited Milling and her children to her home to watch a movie and Bailey was living there. By late November Bailey was openly living at Milling's house with her and her children. Milling *534 stated that at this point she knew Bailey was a fugitive, but had never asked why he was wanted in Georgia. She said she did not know it was for trafficking drugs until after the Commission's investigation began.
In November of 1993, after she and Bailey started seeing each other, Milling summarily dismissed, without a hearing or motion by the county attorney, Bailey's fugitive warrant by writing across its face, "closed with Prejudice  State of Georgia did not come for Defendant." Milling stated she did this in an effort to close out her docket since the justice court no longer had any jurisdiction over the case and she knew of no other way to handle it. Miriam Hynes, the justice court clerk for Newton County, stated that Milling did not normally fill out the disposition of her cases in her docket book, that she, Hynes, usually did that.
Hynes first learned about the disposition of Bailey's case on November 18, 1993, when she was looking for Bailey's folder in the filing cabinet and could not find it. She opened the docket book and saw the disposition written there. It was not unusual for Milling to have a file out of the filing cabinet, so she went into Milling's office and looked on her desk and in her desk drawer but did not see the file. On December 30, 1993, after the Commission's investigation began, Milling returned Bailey's file to Hynes. Milling stated that Bailey's file was on her desk along with several others the entire time.
Hynes stated that Bailey had been to see Milling in the justice court building about a half dozen times. Bailey also came to see Milling at the Municipal Court in Decatur. Jinya Lea Clarke, the Decatur city clerk, stated that on one such occasion in October of 1993, Milling had in her possession the docket, ledger book and the partial payment tickets for fines. These included Bailey's for his August 10, 1993, conviction of possession of alcohol and paraphernalia. Milling was working on the partial payment tickets in the board room across the hall from Clarke's office when Bailey came to see her. Bailey stayed about fifteen or twenty minutes. Shortly thereafter Milling returned the payment book and refiled the partial payment tickets. Sometime later in the month Clarke found Bailey's sheet missing from the partial payment book as well as the tickets themselves. The fines were eventually paid in full by Dawn Bailey, Bailey's sister-in-law.
Some time in late December of 1993, the Newton County Sheriff's Department was called out to Milling's house in the early morning hours in response to a domestic disturbance call. Milling stated that the argument was not serious, that she and Bailey may have shoved each other, but nothing more serious than that. Neither she nor Bailey had called the sheriff's department and she did not press charges against Bailey.
At the time the hearing before the Commission began on June 3, 1994, Bailey had been extradited to Georgia. At the hearing on that day Milling testified that at one point before Bailey was taken back to Georgia she had asked Bailey to move out of her house, but later asked him not to leave because her son wanted him to stay. Later in her testimony she stated, "I knew that I needed to get [Bailey] out of the house, but I didn't want to go file charges or anything like that and make a big scene of it. I guess I was just grasping at hopes that maybe somebody could give me an easier way to do it, other than just putting him out."
Milling stated that Bailey had called her that morning to wish her luck at the hearing, but that their conversation was very brief. When on June 3rd she was asked by her attorney, "if Donald Bailey returns from the State of Georgia, do you intend to take up your relationship with him again?" Milling answered, "No, sir."
Between June 3, 1994, when the hearing recessed and July 8, 1994, when the hearing continued, there were several major developments. On June 10 Bailey plead guilty and was convicted in Georgia on a felony drug charge. He received ten years probation and a fine. Milling and Bailey obtained a marriage license on June 13, 1994, the first business day after returning to Mississippi. After the three day waiting period, they were married on June 16, 1994. Milling stated that the reason she had earlier stated to the Commission that she did not intend to resume her relationship with Bailey if he returned *535 from Georgia was because she "really didn't think he would (pause) be coming home."
On June 4 or 5, one or two days after the hearing recessed, Milling travelled to Georgia with Bailey's father to visit Bailey. She was contacted by Bailey's attorney on June 9th and was told Bailey's hearing was scheduled for the next day and that there was to be a plea bargain. Milling stated that she kept in contact with Bailey's attorney throughout the proceedings. Again on June 10, 1994, she traveled with Bailey's father to Georgia to attend the hearing. Milling actually appeared in court when Bailey entered his plea, but was not questioned. Milling's children wrote letters to the officials in Georgia on Bailey's behalf. Milling also solicited letters for him from a Mississippi state senator. Bailey and Milling returned to her home on Friday night, June 10th, and applied for a marriage license the following Monday.
The testimony reflected that Milling's association with Bailey had an adverse impact on her relationship with the local law enforcement community. Sheriff Hanna stated that Milling's relationship with Bailey had had a bad affect on the professional relationship between the sheriff's office and Milling as a justice court judge. Ron Davis, a Newton County deputy sheriff, stated that Milling's relationship with Bailey, knowing his history, had caused him to lose faith in her as a judge. According to Lisa Creel, a Decatur police officer, after Milling became involved with Bailey she was no longer concerned about the law enforcement officers. She stated members of the public had expressed their concern to her about Milling's voluntary association with Bailey.

DISCUSSION OF THE ISSUES
As was stated in Com'n on Judicial Performance v. Gunn, 614 So.2d 387 (Miss. 1993):
This Court conducts de novo review of judicial misconduct proceedings, giving great deference to the findings, based on clear and convincing evidence, of the recommendations of the Mississippi Judicial Performance Commission. Mississippi Judicial Performance Commission v. Peyton, 555 So.2d 1036 (Miss. 1990); In re Collins, 524 So.2d 553 (Miss. 1987); In Re Inquiry Concerning Garner, 466 So.2d 884 (Miss. 1985); In re Brown, 458 So.2d 681 (Miss. 1984). Although this Court considers the recommendations of the Commission, we are in no way bound by them and may also impose additional sanctions. Mississippi Judicial Performance Commission v. Peyton, 555 So.2d 1036 (Miss. 1990); In re Collins, 524 So.2d 553 (Miss. 1987).
Gunn, 614 So.2d at 389.

1. WHETHER THE RESPONDENT'S CONDUCT CONSTITUTES WILLFUL MISCONDUCT IN OFFICE AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE, PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED.
The Mississippi Commission on Judicial Performance found by clear and convincing evidence that by her conduct and association with Donald Bailey, Milling violated Canons 1, 2A, 2B, 3A(1), 3A(4), 3B(1), and 3C(1)(a) of the Code of Judicial Conduct as well as Section 177A of the Mississippi Constitution of 1890, as amended. We agree.

CANON 1

A Judge Should Uphold the Integrity and Independence of the Judiciary
Milling knew Bailey was a fugitive from the State of Georgia before she began seeing him socially. Even knowing Bailey to be a fugitive, charged with numerous drug related felonies as well as bond jumping, Milling began seeing Bailey and eventually began living openly with him. This relationship began after Bailey had appeared before her in her capacity as a justice court judge on misdemeanor criminal charges and had been found guilty on those charges. Milling admitted allowing Bailey to drive her car even though she herself had suspended his license. She was seen regularly in the company of Bailey after the Georgia charges became public knowledge. On one occasion the Sheriff's Department had to respond to a disturbance call at Milling's house during an *536 argument between her and Bailey. Bailey regularly visited Milling at her offices and after one such visit his file somehow disappeared. The law enforcement community lost confidence in Milling's ability to impartially and satisfactorily perform her duties as a municipal and justice court judge.
Milling's actions were a clear violation of Canon 1 of the Code of Judicial Conduct which states in part, "[a] judge should participate in establishing, maintaining, and enforcing, and should [herself] observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved."

CANON 2

A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities
The Commentary to Canon 2 reads in part:
Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
A justice court judge openly living with a fugitive from another state charged with several drug related felonies without a doubt creates an "appearance of impropriety." Milling knew of Bailey's criminal record and the fact that he was a fugitive from the State of Georgia at the time she began her relationship with him and still "freely and willingly" chose to pursue that relationship. This was an obvious violation of Canon 2 of the Code of Judicial Conduct. Milling argued to the Commission that she did not know what the Georgia charges were when she began seeing Bailey. That is no excuse. Milling knew Bailey was a fugitive as she herself signed his fugitive warrant, and that alone should have placed Milling on notice as to the risk of any personal association.
The fact that she allowed him to drive her car with a suspended license and actively participated in his case in Georgia only compounded the violation of Canon 2. Once Bailey was extradited to Georgia, Milling actively participated in his case. She stated she kept in contact with his attorney throughout the proceedings and solicited letters on Bailey's behalf. Milling also traveled to Georgia on the day Bailey's guilty plea was heard and was present during the hearing. Bailey received ten years probation and immediately returned to Mississippi with Milling.
In Matter of Blackman, 124 N.J. 547, 591 A.2d 1339 (1991), a municipal court judge was given a public reprimand for attending a picnic hosted by a convicted felon. The judge had been friends with Thomas Robert Heroy for eighteen years. Heroy, who plead guilty to federal racketeering charges, was to begin serving a two-and-one-half year sentence two days after his annual Labor Day Picnic. The picnic was also attended by several attorneys and public officials. The judge's attendance at the picnic was reported in local newspapers. The New Jersey Court held the judge violated Canon 2 of the Code of Judicial Conduct by attending the party. That Court stated:
The Canon makes clear that judges have responsibilities with regard to their personal conduct that greatly exceed those of ordinary citizens... .
Improper conduct includes creating or acquiescing in any appearance of impropriety. When a judge chooses to attend a party hosted by a convicted criminal, there may be wholly innocuous reasons explaining such a decision. However, the judge must realize that members of the public cannot know the judge's subjective motives and may put a very different cast on his or her behavior. Such conduct could be perceived as evidencing sympathy for the convicted individual or disagreement with the criminal justice system that brought about the conviction. At worst, such conduct may raise questions concerning the judge's allegiance to the judicial system. Those impressions could generate legitimate concern about the judge's attitude toward judicial responsibilities, weakening confidence in the judge and the judiciary.
*537 Blackman, 124 N.J. at 551, 591 A.2d at 1341-42.
Milling's misbehavior far exceeded that involved in Blackman, as she was not a long-time friend of Bailey's, and she did more than just attend a party hosted by him. She only started seeing Bailey after learning he was a fugitive from the State of Georgia and began living with him a short time later. After he was convicted on a felony drug charge in Georgia, Milling and Bailey returned to Mississippi where they then married. This conduct, undoubtedly, gave rise to legitimate concern about her attitude toward the criminal justice system and her judicial responsibilities.

CANON 3

A Judge Should Perform the Duties of His Office Impartially and Diligently
Canon 3A(1) states: "A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism." In allowing Bailey to drive her car when she herself had suspended his license, Milling clearly was not faithful to the law she was sworn to uphold. Also, Milling was swayed by partisan interests when she actively pursued a fugitive warrant on Bailey's behalf so that he could get out of jail and then summarily dismissed the warrant without notice or hearing.
Canon 3A(4) provides in part: "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding." This Canon was violated when Milling dismissed Bailey's fugitive warrant, ex parte. Milling did not contact or consult the prosecuting attorney, law enforcement officials or anyone else involved in the case.
Canon 3B(1) states: "A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials." Again, dismissing the fugitive warrant against Bailey was a violation of Canon 3B(1). Milling also violated this Canon when she kept Bailey's court file for an extended period of time without notifying the clerk as to its whereabouts. She allowed Bailey to visit her at her office where after one such visit some of Bailey's records disappeared. The Commission held there was insufficient evidence to find Milling had taken the records, but it gave rise to a great appearance of impropriety. We agree that the mysterious disappearance of Bailey's file reflects poorly on Milling and gives rise to the appearance of impropriety on her part.
Canon 3C(1) provides in part:
A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding
Once Milling became personally involved with Bailey she should have recused herself from his case. The relationship between the two certainly raised questions as to Milling's impartiality. Milling violated this Canon when she dismissed Bailey's fugitive warrant, even if it was just to clear her docket as she claimed.

Miss. Const., Art. 6, § 177A
Section 177A of the Mississippi Constitution of 1890, as amended, provides in part that on the recommendation of the Commission, this Court may sanction any judge of this state for, inter alia, "willful misconduct in office" or "conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Milling's conduct stemming from her relationship with Bailey is in blatant violation of § 177A.
As we stated in Com'n on Judicial Performance v. Gunn, supra:
The official integrity of the justice court judges is vitally important, for it is on that level that most citizens have their only experience with the judiciary. In Re Inquiry Concerning Garner, 466 So.2d 884, 887 (Miss. 1985). Therefore, it is imperative *538 for justice court judges to conduct themselves with the utmost diligence in order to uphold the public's confidence.
Gunn, 614 So.2d at 389-90.
"Willful misconduct and conduct prejudicial to the administration of justice which bring the judicial office into disrepute" has been defined as follows:

Willful misconduct in office is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith.
Willful misconduct in office of necessity is conduct prejudicial to the administration of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute. (emphasis theirs).
Gunn, 614 So.2d at 390. (quoting In re [Lloyd] Anderson, 412 So.2d 743, 745 (Miss. 1982)). See, In re Nowell, 293 N.C. 235, 237 S.E.2d 246, 255 (1977). See also, Miss. Com'n on Jud. Performance v. Ishee, 627 So.2d 283, 289 (Miss. 1993); In re Quick, 553 So.2d 522 (Miss. 1986); Miss. Jud. Performance Com'n v. Coleman, 553 So.2d 513 (Miss. 1989); In Re Collins, 524 So.2d 553 (Miss. 1987); In Re Stewart, 490 So.2d 882 (Miss. 1986); In Re Inquiry Concerning [William] Anderson, 451 So.2d 232 (Miss. 1984).
Milling's position as a justice court judge incurred upon her the responsibility to maintain a level of integrity, in both her professional and personal life, that most ordinary citizens are not required to meet. While we do not wish to be repetitious, it is enough to say that Milling's actions in regard to her relationship with Bailey, including but not limited to obtaining a fugitive warrant on his behalf and then summarily dismissing that warrant, allowing him to drive with a suspended license, openly living with an accused felon and actively participating in his criminal case in the State of Georgia, showed that she acted "intentionally, or with gross unconcern for [her] conduct" in violating numerous canons of the Code of Judicial Conduction and thereby bringing the her judicial office into disrepute.

2. SHOULD THE RESPONDENT, JUDGE ANGELA MILLING, AKA ANGELA MILLING BAILEY, BE REMOVED FROM OFFICE, FINED IN AN AMOUNT EQUAL TO ANY JUDICIAL SALARY SHE MAY RECEIVE AFTER OCTOBER 1, 1994 AND ASSESSED THE COSTS OF THIS PROCEEDING BY THE MISSISSIPPI SUPREME COURT, PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION OF 1890, AS AMENDED.
The sanctions available to this court for judicial misconduct include, pursuant to § 177A, removal from office, suspension, fine or public censure or reprimand. The Commission in this case recommends Milling be removed from office and fined in an amount equal to any judicial salary she may receive after October 1, 1994, and assessed the costs of this proceeding for willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.
In a case cited by the Commission, the Nebraska Supreme Court aptly discussed the purpose of imposing sanctions for judicial misconduct:
The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient *539 to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of Nebraska that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men. See, Disciplinary Proceedings Against Buchanan, 100 Wash.2d 396, 669 P.2d 1248 (1983); Matter of Ross, 428 A.2d 858 (Me. 1981).
In re Kneifl, 217 Neb. 472, 485-86, 351 N.W.2d 693, 700 (1984).
In the past, this Court has held that multiple sanctions may be imposed "if the complaints against a judge constitute more than one of the proscribed categories pursuant to our state constitution." Miss. Com'n on Jud. Performance v. Ishee, 627 So.2d 283, 289 (Miss. 1993), citing In re Branan, 419 So.2d 145, 147 (Miss. 1982). We have recognized that when dealing with judicial misconduct, the sanction or sanctions should fit the offense and be consistent with that imposed in similar cases. Miss. Com'n on Jud. Perf. v. Chinn, 611 So.2d 849, 856 (Miss. 1992); In re Bailey, 541 So.2d 1036, 1039 (Miss. 1989).

A. REMOVAL FROM OFFICE
The Commission unanimously recommended that Milling be removed from office. This Court has never before dealt with judicial misconduct stemming from a judge's relationship with an accused or convicted criminal. However, we have not hesitated to remove a judge from office when the misconduct involved warrants such action. See Chinn, 611 So.2d at 849 (Miss. 1992) (abuse of contempt powers, ticket fixing, failure to abide by statutes and attempts to influence other judges warranted removal from office); Judicial Performance Com'n v. Hopkins, 590 So.2d 857 (Miss. 1991) (justice court judge removed from office for the combination of allowing clerks to dismiss tickets without hearing, failing to sign court dockets and dismissing tickets in exchange for information of other criminal activity); Miss. Jud. Performance Com'n v. Coleman, 553 So.2d 513 (Miss. 1989) (utilizing criminal processes to collect fines and fees, failing to properly account for said fines, and converting them to own use warranted removal from office); In re Quick, 553 So.2d 522 (Miss. 1989) (justice court judge removed from office for adjudicating numerous DUI convictions and routine traffic convictions without reporting convictions to Commissioner of Public Safety); In re [Lloyd] Anderson, 412 So.2d 743 (Miss. 1982) (imposing traffic fines greater than that officially reported and paid to the county warranted removal from office).
The Commission cites four cases which it feels have some similarities to the case at bar. In re Haggerty, 241 So.2d 469 (La. 1970) (judge removed from office for, inter alia, illegal gambling and associating with known criminals); Matter of Blackman, supra; (given public reprimand for attending a picnic hosted by a convicted felon who was a former public official and long-time friend); In re Jett, 180 Ariz. 103, 882 P.2d 414 (1994) (judge who reported her own misconduct was suspended for the remainder of her term, approximately forty-five months, after she signed order releasing her live-in boyfriend, who was arrested following a domestic dispute, from jail three or four hours earlier than he normally would have been released); In re Anderson, 451 So.2d 232 (Miss. 1984) (justice court judge removed from office for, inter alia, perjuring himself before the Commission).
With the possible exception of the conduct of the judge in Haggerty, Milling's actions were significantly more egregious than that of the judges in the cases cited by the Commission. She did not commit just a single isolated act of misconduct, but rather made a conscious decision to become involved with a person who had appeared in her court as a defendant and who she knew was a fugitive from another state. Milling knew or should have known a relationship with such a person would bring her judicial office into disrepute. This relationship resulted in specific *540 violations of the Code of Judicial Conduct, such as dismissing Bailey's fugitive warrant, condoning and even asking him to drive with a suspended license, participating in his criminal case in Georgia and lying to the Commission about her intent to continue the relationship.
We do not address the morality of any issues here, and we do not wish to exercise control over the matrimonial and/or personal affairs of the judiciary, save and except when the same allegedly violate the Code of Judicial Conduct or the constitution. However, when Milling married Bailey, a then convicted felon, she in effect made it impossible to repair the damage done to the reputation and integrity of her judicial office. As long as she remains in office, that office will remain in disrepute. Milling's co-workers, the law enforcement community and no doubt the citizens of Newton County have lost trust in her ability to carry out her judicial responsibilities impartially. Because of the gravity of her misconduct and extreme likelihood that even if other lesser sanctions were imposed her office would remain in disrepute, removal from office is the only appropriate sanction in this instance.

B. FINE
In addition to the recommendation that Milling be removed from office the Commission voted six-to-one to recommend she also be fined in an amount equal to any judicial salary she may receive from the date of October 1, 1994. (The one remaining member voted to recommend the imposition of a $500.00 fine). The Commission argues this fine would reflect the amount Milling was unjustly enriched by her violation of a Memorandum of Understanding entered into between her and the Commission wherein she agreed to resign from office on or before October 1, 1994, and not to serve in any judicial office in the future.
The Commission argues that Milling's deceit allowed her to remain in office for an additional month before the Commission could file its recommendation with this Court. Because of her failure to abide by the Memorandum of Understanding, the Commission contends any salary she received or will receive after the agreed upon date of her resignation, October 1, 1994, constitutes unjust enrichment and she should be fined a sum equal to that amount.
There is recent precedent for imposing a fine equal to salary received over a certain period of time. In Miss. Com'n on Jud. Performance v. Ishee, 627 So.2d 283 (Miss. 1993), this Court, agreeing with the Commission's recommendation, imposed a public reprimand and a fine of $5,600.00 upon Ishee for failing to resign as justice court judge while seeking election to the non-judicial office of circuit clerk. The Court held that "[a]lthough the fine is a large one, it has a rational computational basis in the salary received by Ishee during the period of time he was required to resign and did not." Ishee, 627 So.2d at 290. As in Ishee the recommended fine in the case at bar has a rational computational basis.
Although it is a rare occurrence, this Court has in the past imposed the multiple sanction of a fine in addition to removing a judge from office. This was done in In re Brown, 458 So.2d 681 (Miss. 1984). In that case, Brown, a justice court judge, was found to have converted to his own use money of civil litigants in 170 different cases in an amount aggregating $21,983.32. The Commission recommended Brown be publicly reprimanded and fined $1,400.00, the amount not reimbursed to civil litigants who could not be found, to prevent his undue enrichment. This Court accepted this recommendation, but also imposed the additional sanction of removal from office.
While we agree Milling should be sanctioned for breaching the Memorandum of Understanding she entered into with the Commission, we do not impose the recommended fine for that reason alone. This Court does not wish to set a precedent whereby any breach by a judge of an agreement entered into between that judge and the Commission means a forfeiture of judicial salary. We affirm the Commission's recommendation based entirely on the facts of this case.
Milling's breach of the Memorandum of Understanding was the proverbial straw that *541 broke the camel's back. Her obvious disregard for the Code of Judicial Conduct and § 177A of the state constitution and her lying to the Commission about her relationship with Bailey in and of themselves may not have warranted such a fine. However, when that misconduct is coupled with the breach of the Memorandum of Understanding we feel Milling should not be able to benefit from the resulting delay of these proceedings. Therefore, we affirm the Commission's recommendation that Milling be fined in the amount of any salary she may have received as a justice court judge after the date of October 1, 1994.

CONCLUSION
After careful consideration of the findings of fact and recommendations of the Commission on Judicial Performance, as well as a thorough examination of the record, we find, by clear and convincing evidence, that Milling has violated Canons 1, 2A, 2B, 3A(1), 3A(4), 3B(1), and 3C(1)(a) of the Code of Judicial Conduct and Section 177A of the Mississippi Constitution.
Milling is clearly guilty of willful misconduct in the performance of her judicial duties, and her misconduct brought her judicial office into disrepute.
Milling's conduct as a judge should have been above suspicion; yet, unfortunately, her misconduct created the deepest suspicions with her colleagues, officers of the court, and the public she served. Her serious departure from proper standards of conduct rendered her the violator, and it now justifies the punishment and penalty imposed upon her.
We accept the Commission's recommendation of Milling's removal from office as the only way to reestablish the reputation and integrity of the office of Newton County Justice Court Judge, District One.
Additionally, finding the recommended forfeiture of salary from and after October 1, 1994, to be reasonable under the facts and circumstances of this case, we affirm the Commission's recommendation that Milling be fined in an amount equal to the salary she has received as a Justice Court Judge since October 1, 1994.
Milling is assessed with all costs of this proceeding.
This opinion constitutes formal and official notice of the removal of Angela Milling, a/k/a Angela Milling Bailey, from the office of Newton County Justice Court Judge, District One, as per the terms contained herein. The Clerk of this Court shall forward attested copies of this opinion to the Secretary of State and State Auditor of Mississippi, as well as to the clerks of the Newton County Justice, Chancery and Circuit Courts and to the Newton County Board of Supervisors.
ANGELA MILLING A/K/A ANGELA MILLING BAILEY, JUSTICE COURT JUDGE, DISTRICT ONE, NEWTON COUNTY, MISSISSIPPI, IS HEREBY REMOVED FROM OFFICE AS OF THIS DATE AS PER THIS OPINION.
HAWKINS, C.J., LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, McRAE and SMITH, JJ., concur.
HAWKINS, C.J., concurs with separate written opinion joined by DAN M. LEE, P.J., and McRAE, J.
HAWKINS, Chief Justice, concurring:
I concur except that I would in addition impose a fine of $500.00.
DAN M. LEE, P.J., and McRAE, J., join this opinion.
NOTES
[1] During the course of the Commission's hearing on this matter, Angela Milling married Donald Elmer Bailey, Jr. and now goes by the name Angela Milling Bailey. The name Milling is used in this opinion to avoid confusion in references to her and Mr. Bailey and also because a majority of the events and testimony which concern us here occurred prior to the marriage.
[2] During the course of the Commission's investigation and hearing on this matter, Milling was represented by counsel. After the hearing her attorney filed a Motion to Withdraw which was approved by Milling herself, acting as Justice Court Judge. On November 28, 1994, over a month after the Commission filed its findings and recommendations with this Court, Milling sent a letter to the clerk of this Court asking if it was possible for an attorney to be appointed for her. This Court treated that letter as a motion and denied it in an order dated December 8, 1994.
[3] The Commission filed with this Court a Motion for Interim Suspension of Milling on October 18, 1994. Finding the motion to be well taken, we granted the motion in a order dated January 24, 1995, whereby Milling was suspended from exercising any judicial authority pending the outcome of this decision.